144

In the Matter of the Complaint against ROBERT L. BRADLEY, a police officer. B. H. TURK,
*Complainant and Respondent,*

vs.

ROBERT L. BRADLEY,

*Appellant.*

(No. 2692; February 21st, 1956; 293 Pac. (2d) 678)

For the appellant, the cause was submitted upon the brief of John F. Raper and Kenneth Chetwood, both of Sheridan, Wyoming, and oral argument by Mr. Raper.

For the complainant and respondent, the cause was submitted upon the brief and also oral argument of Robert E. Holstedt of Sheridan, Wyoming.

OPINION

HARNSBERGER, Justice.

Robert L. Bradley, a member of the police force of the city of Sheridan, was charged by the Chief of that department with insubordination and disrespect to his superior officer. After the officer had been given notice thereof, a hearing was held before the Police Department Civil Service Commission of Sheridan in accordance with the provisions of § 29-1513, W.C.S., 1945. The commission found the officer had violated Rule 15 of the commission's rules and regulations, that he had failed to treat his superior officer with respect and was guilty of insubordination, to the detriment of the efficiency of the police department; and the commission discharged Officer Bradley. Appeal was taken by Bradley to the district court, in accordance with the provisions of § 29-1514, W.C.S., 1945, where a trial was held and voluminous testimony received relating to the circumstances under which the alleged violations were said to have occurred. At the conclusion of this trial, the district court entered its judgment, making its own findings of fact and conclusions of law and adjudging and decreeing that the findings of fact and decision of the commission be confirmed and the officer be discharged as a member of the police department of the city of Sheridan. It is from this judgment the officer appeals.

Although the record does not so advise us, the parties seem to have accepted without question that the city of Sheridan had established a Civil Service Commission in accordance with the provisions of § 29-1502, W.C.S.,

1945; so we will assume this to be true for the purposes of this case.

Section 29-1513, W.C.S., 1945, provides:

"All persons at the time of the adoption of the Act (§§ 29-1501—29-1523), occupying positions affected by the provisions of this Act, may retain their positions until discharged under the provisions hereof. Discharge from the Police Department or reduction in grade or compensation, or both, may be made for any cause, not political or religious, which will promote the efficiency of the service, but only on written notice and specifications filed with the Commission, a copy thereof shall be served upon the person affected, who shall have the right, within ten (10) days from service of said copy, to answer the charges to the same and to demand a public hearing before said Commission. The Commission after hearing, or an investigation shall determine whether the reason for discharge is sufficient and no person employed in the Police Department shall be discharged or reduced in pay or rank without the consent of the Commission after a hearing, unless such discharge or reduction in pay is in pursuance of authority of Section seven (7) [§29-1507] of this Act. The written statements of cause, together with any answer that may be made hereto, and the Commission's decision shall be filed with the clerk of such city."

Section 29-1514, W.C.S., 1945, follows and provides, in part:

"The decision of the Commission upon any objection may, within the time and in the manner herein prescribed, be reviewed by the District Court upon an appeal thereto taken in the following manner:  *  *  * and the District Court shall  *  *  * hear and determine such appeal, after a trial De Novo, without a jury. An appeal shall lie to the Supreme Court from the judgment of the District Court, as in other civil cases."

Rule 15 of the Rules and Regulations of the Police Department Civil Service Commission, which is alleged to have been violated, is as follows:

"Every officer shall obey the orders of his superior officers. He shall treat his superiors with respect, and in his demeanor to his associates on the force he shall be courteous and considerate, guarding himself against envy, jealousy ond other unfriendly feelings; refrain from all communications to their discredit, except to his superior officers, whom it is his duty to inform of any and every neglect or disobedience of orders on their part that may come to his knowledge."

On the day the officer was charged with misconduct, he and a fellow officer named Macklay had been assigned for general police work at the local rodeo grounds. Although no specific directions were given these officers and notwithstanding the evidence completely fails to show they did anything which would have justified any complaint regarding their conduct, and although there was no evidence which, fairly considered, showed that any complaint had actually been made against them or the way in which they performed their police duties, the Chief evidently considered that a somewhat indefinite statement made to him by one of the rodeo officials indicated that the official was dissatisfied with the way the officers had stationed themselves at the grandstand. However, the rodeo official, in his testimony, carefully refrained from saying he had made any such complaint. After the rodeo the officers were proceding to the police station when they saw a man they recognized as an escapee from the "Fort," which we understand referred to the Veterans Administration Hospital at Ft. McKenzie, Sheridan, Wyoming. They took the escapee into custody and continued on to the station. Almost immediately upon their arrival, the Chief told them to sign up on the "sleeper book" the escapee and another person who was there present.

Macklay told the Chief the name and identification of the escapee and proceeded to sign up the other man. Some angry and violent words were exchanged during which Bradley asked the Chief why he did not have some of his pets sign the men up. After some further conversation between the men, the Chief told Bradley that he could not use him any longer, and Bradley then "turned in his gear." The next day Bradley returned for duty but the Chief told him he was through and proceeded to file the charges mentioned above.

While appellant has considerable to say regarding the meaning of § 29-1514, W.C.S., 1945, where it says that upon appeal to the district court from a decision of the commission, the district court shall "hear and determine such appeal, after a trial De Novo," and insists this means there is to be a complete retrial in the district court, rather than a review of the proceedings before the commission, it appears from the record before us that irrespective of its propriety there was in fact a complete retrial in the district court, so we need not consider the point here. It is also unnecessary for us to consider the numerous errors specified with respect to rulings on admissibility of evidence or the court's adverse ruling on appellant's motion to dismiss, in view of the disposition which we make of this case. The only decision necessary for that purpose is whether there was any substantial evidence to justify the court's findings that the officer violated Rule 15 of the commission's regulations, that he failed to treat his superior officer with respect, and that he was guilty of insubordination, all to the detriment of the efficiency of the police department.

There is little to be gained by recounting at length the testimonies given in support of the charges filed against Bradley, as each witness who so testified had his own version and recollection as to what was actually said and as to just when it was said. It is sufficient

to say that the Chief himself admitted that when Officers Bradley and Macklay returned to the police station after working the rodeo the Chief was angry and hostile to them and that he used vile, foul, and indecent language in accusing them of sitting around all afternoon. It was in this atmosphere that Bradley spoke the words relied upon by the Chief to support his charge that Bradley was disrespectful and insubordinate. We must, of course, accept the Chief's version that he ordered or at least directed the *officers* to sign up on the "sleeper book" the two men, the Chief's own testimony being that he *"told them"* to sign the men up. The Chief's indefiniteness in making answer, under searching questioning, as to whether Officer Macklay proceeded at once to sign the men up, taken together with his more direct admission that Macklay actually did sign one of the men up and reported that the other man was an escapee, giving his name and identification, does not suggest there was any appreciable interval between the time the order was given and the time it was complied with. This certainly leaves Bradley without fault on that score as the order was carried out by one of the two officers to whom the order was addressed.

But the Chief further said the insubordination charged occurred when Bradley "asked me why didn't I have some of my old pets do this work." Admittedly such a remark was hardly proper; but to say that it was either disrespectful under all the circumstances, or that it was a refusal to comply with a superior's order when that order as given was being complied with, or that the remark was an act of insubordination, is to strain inference and implication to an undue extreme. The Chief's treatment of the officers was neither courteous nor considerate; and while we do not say that the Chief's violation of Rule 15 sanctioned its violation by others, yet his hostile attitude and insulting remarks so lowered the plane of proper relationship

between the two men as to render Bradley's question innocuous. Men are but human and subject to all the feelings, passions, and emotions of their kind; and extended emphasis and intendment should not be placed upon words spoken, as they were, in hot blood and aroused temper, especially when provoked by intemperate actions of the Chief himself. To read into those words an insubordinate refusal to obey a superior's order, under all the circumstances existing at the time, does not accord with our sense of justice. True, Bradley's remark was improper, as we have already said, but our belief that the remark was only thoughtlessly and improvidently made but without any intention to be disrespectful is borne out by the further testimony of the Chief when he stated that shortly thereafter Bradley said to him, "It's about time to quit acting like kids." This quasi apology surely indicated Bradley intended no disrespect and had only spoken hastily and in the momentary anger the situation had engendered. We cannot approve a judgment which deprives a policeman of his employment on the slender ground that he was disrespectful to his superior officer when the superior's conduct was unworthy of respect and invited disrespect. It is said that the extreme penalty of removal should not be visited upon a police officer for the mere technical violation of a rule which is not shown to have prejudiced any rights of the public or interfered with the discipline of the department. 62 C.J.S., Municipal Corporations § 578. Discipline was not flaunted when Bradley asked why the Chief did not get his old pets to do the signing up. Discipline vanished when the Chief vented his violent temper in anger and hostility toward the officer.

We have kept in mind our adherence to the rule that a trial court's findings of fact will not be disturbed whenever it appears that there is any substantial evidence upon which such findings could properly be made,

and it is with considerable reluctance that we must now hold there is no such evidence in this case. In consequence, the judgment of the district court must be reversed and the cause remanded with directions that Officer Bradley be reinstated as a police officer and member of the police force or police department of the city of Sheridan, Wyoming, as of the date of his separation from that service pursuant to the Findings and Decision of the Police Department Civil Service Commission of the City of Sheridan, Wyoming, discharging him as a member of that city's police department.

We realize the reinstatement of Mr. Bradley as a member of Sherdian's police force will more than likely give rise to questions as to what, if any, compensation he is entitled to receive from the date of his wrongful discharge until his reinstatement. We were somewhat hopeful that such directions might be given as would forestall controversy in that matter; but after some study and research, we conclude that, inasmuch as there are involved numerous questions not within the issues presented upon this appeal and concerning which the views of interested parties are entitled to be advanced before any decision is reached, the matter must be left open at this time. We will however invite counsel's attention to the discussions relative to the subject appearing in 5 C.J.S., Appeal and Error § 1835 et seq.; Stockton v. Department of Employment, 25 Cal. 2d 264, 153 P. 2d 741, 746; Ahlstedt v. Board of Education, 79 Cal. App. 2d 845, 180 P. 2d 949, 955; Carter v. City of Los Angeles, Cal., 181 P. 2d 103, 108; Wylie v. State Personnel Board of California, 93 Cal. App. 2d 838, 209 P. 2d 974, 976; Thompson v. City of Long Beach, Cal., 250 P. 2d 312, 323; Kelly v. Chicago Park Dist., 409 Ill. 91, 98 N.E. 2d 738, 742; State v. Woldman, 157 Ohio St. 264, 105, N.E. 2d 44, 46, 47, 48; State v. Kansas City, 319 Mo. 705, 7 S.W. 2d 357, 59 A.L.R. 95; Hittell v. Chicago, 327 Ill. 443, 158 N.E.

683, 55 A.L.R. 994; Annotation, 55 A.L.R. 997 et seq.; Cowan v. State, 57 Wyo. 309, 116 P. 2d 854, 136 A.L.R. 1330.

*Reversed with directions.*

BLUME, C. J., concurs.